[Civ. No. 28109. First Dist., Div Two. Mar. 21, 1972.]

AMEL DRINNON, Plaintiff and Appellant, v.
FRANK THOMAS OLIVER, Defendant and Appellant;
ALLSTATE INSURANCE COMPANY, Intervener and Respondent.

572

**COUNSEL**

Tunney, Carlyle & Bennett and Gerald P. Tunney for Plaintiff and Appellant and for Defendant and Appellant.

Robert E. Cartwright, Edward I. Pollock, Theodore A. Horn, Marvin E. Lewis, William H. Lally, Joseph W. Cotchett and Leonard Sacks as Amici Curiae on behalf of Plaintiff and Appellant.

Hoge, Fenton, Jones & Appel and John W. Appel for Intervener and Respondent.

**OPINION**

**TAYLOR, P. J.**—This controversy arises out of an accident that occurred on July 6, 1968, when A. Drinnon was struck from the rear by a Willys

jeep operated by F. T. Oliver. After Oliver's insurer, Allstate Insurance Company (hereafter Allstate), denied coverage, Drinnon obtained a default judgment against Oliver. Drinnon and Oliver settled their controversy and commenced an action against Allstate. Thereafter, Allstate moved to set aside the default, intervene in the action between Drinnon and Oliver, and file an answer on behalf of Oliver.

On this appeal by Drinnon and Oliver from the order[1] setting aside the default judgment and permitting Allstate to intervene and answer, the contentions are: 1) Oliver and Drinnon were not estopped from enforcing the default judgment against Allstate; 2) the default judgment was not void on its face; 3) Allstate should not have been permitted to intervene after judgment, as Code of Civil Procedure section 387 permits intervention only before judgment; 4) there were no grounds for setting aside the default judgment pursuant to Code of Civil Procedure section 473; 5) the court erroneously admitted hearsay and made findings not supported by the evidence; 6) Drinnon was entitled to attorney fees; and 7) Allstate should not be permitted to answer on behalf of Oliver over his objection. We have concluded that the order must be reversed.

The record reveals the following chronology of the facts essential to comprehension of the issues on appeal.

On February 5, 1968, Frank T. Oliver made a written application with Allstate for liability insurance on two vehicles: a 1961 Willys used commercially, and a 1962 Ford, used as a passenger car. Oliver gave the Allstate agent, William Chapin, a check for $31, of which $15 was for the premium on the Willys and the remaining $16 on the Ford. As the annual premium of $129 on the Willys was to be paid in 10 monthly installments of $13.40,[2] each monthly premium payment afforded coverage for about 36 days.

Chapin, Allstate's agent, planned to provide Oliver with two separate policies as the Willys did not qualify for as good a policy as the Ford, and prepared two separate applications. Allstate, however, issued one commercial policy, No. 34 638722, for both vehicles. About February 14, 1968, Allstate discovered this error and issued two separate policies, No. 34 638T722 for the Willys, and No. 34 640373 for the Ford. At this time, Allstate's control card for the new Willys policy reflected a payment of $31 and a deduction of $16 for the Ford.

---

[1]All of the prior orders and notices of appeal were merged in the final order dated January 8, 1970, filed January 9, 1970, and the notice of appeal from that order filed by Oliver and Drinnon on January 30, 1970.

[2]Each monthly premium payment of $12.90 carried a service charge of $.50, hence the difference between $134 and $129.

On March 14, 1968, Oliver's original check for $31 was returned by the bank marked "Refer to Maker." Allstate debited the Willys policy control card $31 (instead of $15) and sent Oliver a cancellation notice, effective April 1, 1968. On March 16, 1968, Allstate received and credited a payment of $28.60 for the Willys policy; on March 26, 1968, Allstate received an additional payment of $14.70 for the Willys policy. Thus, the Willys policy was reinstated without lapse of coverage.

On April 17, 1968, Allstate sent a notice of intent to cancel the Willys policy, effective May 1, 1968, unless $13.40 was received. Mrs. Oliver denied receiving this notice. By the time of the cancellation on May 1, 1968, Allstate had received and credited to the control card for the Willys policy a total of $43.30. This amount was sufficient for insurance coverage for approximately 3½ months. On July 1, 1968, Oliver sent a check to Allstate for $26.80. The check was negotiated by Allstate prior to July 6, but credited to the wrong account number.

On July 6, 1968, Drinnon and Oliver were involved in an accident. Mrs. Oliver immediately notified Allstate and subsequently gave a statement to an Allstate adjuster. On July 15, 1968, Drinnon's attorney, Mr. Tunney, notified both Oliver and Allstate of his representation. On July 22, 1968, Tunney received a telephone call from an Allstate representative who advised that Allstate was not involved as the policy covering the Willys had been cancelled on May 1. On July 24, 1968, Tunney wrote to the Olivers, indicating that Allstate had denied coverage and asking them to call him regarding possible insurance coverage.

Mrs. Oliver telephoned Allstate and was advised of the cancellation. An Allstate interoffice memorandum dated August 22, 1968, signed by B. Braden and addressed to J. Jenkins, stated: "Some poor handling at the start in D.U. Actually merely miscommunication regarding covering issue. Adjuster tried to settle injuries not too serious. We failed to send reservation of rights and should send PAR. Attorney should be notified." The contents of this memorandum were never communicated.

Prior to August 27, 1968, Tunney again inquired whether Allstate was still denying coverage. Mr. Rohland, the Allstate claims supervisor, told Tunney that Allstate was denying coverage and was not interested in any claims or litigation involving the accident of July 6. On August 27, 1968, Rohland wrote to the Olivers, denying any and all liability for the accident as the Willys policy had been cancelled on May 1. Tunney received a copy of the letter, which concluded: "The Allstate Insurance Company will take no further action with respect to any claims which you may have

against it or with respect to any claim or suit against you which has arisen or which may arise out of said accident and hereby withdraws from the matter entirely."

On August 30, Agent Chapin wrote a note to Mrs. Oliver stating that there had been a foul-up in the posting of the premium payments and that coverage would be reinstated without lapse. On September 19, Agent Chapin received a reply to a written inquiry he had made on August 22 concerning the $26.80 check sent by the Olivers on July 1. This reply stated that the check was being held by Mr. Fancoeur in accounting, pending determination of the claim, "If claim is honored, he will reapply [the premium]. If claim is rejected, he will refund." (A refund in the amount of $30.50 was finally sent to Oliver on October 2, 1968.)

On September 12, 1968, Tunney contacted the Allstate claims office and was told that a note in Rohland's file indicated that Allstate would be extending coverage. On September 24, Tunney talked to either Rohland or a Mr. Teese and was told that Oliver had made a premium payment that had been credited to the wrong account. However, when Tunney again talked to Rohland, he was told that Allstate was still denying coverage.

On October 16, 1968, Tunney wrote to the Olivers to inform them that Allstate was still denying coverage. On October 29, Mrs. Oliver called Tunney and told him of the July 1 premium payment. Tunney called Rohland and was again told that Allstate denied coverage.

On November 12, 1968, Tunney saw Rohland and was told that the records of the premiums paid by Oliver were in the Menlo Park office. Rohland provided Tunney with a copy of a cancellation notice and affidavit of mailing dated April 18, 1968, and reiterated that Allstate was denying coverage. On November 13, Tunney talked to Agent Chapin and learned that Allstate had made a bookkeeping error and posted Oliver's premium payment to the wrong account, and that Chapin had notified the Menlo Park office of the error.

On December 11, 1968, Tunney wrote Allstate of his intention to file suit on behalf of Drinnon and asked whether its position had changed. On December 17, 1968, Tunney sent Allstate a list of special damages and stated that Drinnon was willing to settle for $25,000.

Tunney received a reply dated December 27, 1968, signed by Rohland, stating that Allstate's position "has not changed from our initial disclaimer of August 27, 1967" [*sic*]. Rohland's letter continued: ". . . and we, once again, hereby disclaim and deny any and all liability or obligations to Oliver and or others under policy number 34-640-373."

As of December 11, 1968, however, Rohland had been instructed to refer the Oliver matter to someone else if a complaint was filed and a summons served, and a notation: "If he files and serves, we will have to defend," was made on the bottom of Tunney's letter of December 11. This change of position was not communicated to either Oliver or Tunney.

Thereafter, at the request of Tunney, Mrs. Oliver delivered to him seven cancelled checks for the premiums paid to Allstate on both policies. On January 3, 1969, Tunney sent to Allstate a comprehensive letter outlining his version of the transactions with Oliver, and enclosing photocopies of the cancelled checks and a schedule calculating the number of days of insurance purchased by each premium payment. The letter pointed out that the cancellation notice of April 18 was premature, asked Allstate to re-evaluate its position, and provide the reasons for the denial of coverage. As Mr. Tunney received no response to this letter for two weeks, he filed Drinnon's complaint against Oliver on January 17, 1969. The summons and complaint were served on Oliver on January 28, 1969.

On February 11, 1969, Tunney received a letter dated February 10, 1969, from D. M. Haak, Allstate's casualty analyst, replying to the letter of January 3. Haak acknowledged the accounting error but stated that when the $26.80 was received in July, the policy had been out of force for 30 days and a refund was made as a new application was necessary. Haak's letter concluded: "I hope the foregoing will explain the transactions clearly enough to facilitate your understanding of why the policy covering the Willys vehicle was cancelled. If you have any further questions, please contact me."

On February 11, 1969, a request to enter default and a declaration of service of summons and complaint were filed. The action between Drinnon and Oliver was tried on February 27, 1969, and continued until March 10, 1969. On March 10, 1969, the judgment in favor of Drinnon in the amount of $60,267.24, plus costs of suit, was entered in the clerk's minutes. On March 20, 1969, the original summons was returned and the written default signed by the court.

On March 12, 1969, Drinnon and Oliver entered into a hold harmless agreement, whereby Oliver assigned his cause of action against Allstate to Drinnon and also engaged Drinnon's attorney Tunney to file an action against Allstate. Drinnon and Oliver filed their action against Allstate on April 10, 1969; service of summons and complaint was made on April 14, 1969. Thereafter, Allstate's motion for leave to intervene and to set aside the default was granted.

The trial court found the facts substantially as stated above and further found that: 1) neither Oliver nor Tunney ever notified Allstate that suit had been filed against Oliver and service effected; 2) on July 6, 1968, Allstate's policy was in effect and Oliver entitled to coverage and defense as he was not delinquent in his monthly premium payments; 3) Allstate by mistake sent the cancellation notice as a result of its bookkeeping error caused by Oliver's original insufficient funds check; 4) Allstate stipulated that it would provide coverage without limit for the accident; and 5) Allstate was negligent in its bookkeeping and investigation of its bookkeeping.[3]

The court concluded that: 1) Allstate had standing to intervene for purposes of setting aside and vacating the default judgment and a substantial interest in the matter as Oliver's insurer; 2) because of the prior relationship between Allstate and Drinnon and Oliver, they were estopped from enforcing the default judgment; 3) the default judgment was rendered against Oliver through his mistake, inadvertence, surprise and excusable neglect, and through Allstate's mistake, inadvertence, surprise and excusable neglect; 4) the default judgment was void on its face because at the time the default was entered, there was no return of summons filed. The court ordered vacation of the default and granted Allstate leave to intervene and file an answer on behalf of Allstate on condition that Allstate provide coverage without limit and denied attorney fees to Drinnon.

The first contention on appeal is that the trial court erred in concluding that Oliver and Drinnon were estopped from enforcing the default judgment against Allstate.

As to Oliver, the trial court found that he had never notified Allstate of Drinnon's action against him and the entry of the default judgment. The finding is predicated on an assumption that Oliver had a duty to cooperate with Allstate even after the repeated denial of coverage and defense. Allstate argues that it merely mistakenly denied coverage and never denied defense, as it was never notified of the action and given an opportunity to defend. This is sheer sophistry. The repeated denials of policy coverage on grounds of cancellation clearly indicated that Allstate had no interest or responsibility in the matter. Rohland's letter of December 27 reiterated that Allstate had "not changed from our initial disclaimer of August 27" and would take the position that there was no liability coverage to Oliver on July 6.

---

[3]Although the record does not indicate that the findings were signed by the court, the parties do not dispute them.

In *Peterson* v. *Allstate Ins. Co.*, 164 Cal.App.2d 517 [330 P.2d 843], which is on all fours with the instant case, the insurer, after being notified of the accident, indicated that it would not defend because the policy had been cancelled for nonpayment of premium. In *Peterson*, as here, the denial of coverage was based on an error concerning the payment of premium. The action against the insured in *Peterson* was commenced by the injured party after the insurer's denial. The court held that once the insurer had wrongfully denied liability and refused to defend, the insured was released from his obligation to leave the management of the claim to the insurer and was justified in proceeding on her own account in whatever manner seemed proper to her under the circumstances. *Peterson* followed the well settled California rule (*Ritchie* v. *Anchor Casualty Co.*, 135 Cal.App.2d 245 [286 P.2d 1000]; *Kennedy* v. *American Fidel. & Cas. Co.*, 97 Cal.App.2d 315 [217 P.2d 457]; *Lamb* v. *Belt Casualty Co.*, 3 Cal.App.2d 624 [40 P.2d 311]) that is also the rule of the majority of jurisdictions (*Indemnity Ins. Co. of North America* v. *Forrest* (9th Cir. 1930) 44 F.2d 465; see cases collected in 49 A.L.R.2d 755).

Nor was Oliver obligated to notify Allstate of the service of summons. *Williams* v. *General Insurance Co.*, 8 Cal.2d 1 [63 P.2d 289], holds that the insurer's disclaimer amounted to a waiver of delivery to the insurer of a copy of the summons and complaint served on the insured.

■ As to Allstate's contention that there was an initial failure of consideration because of Oliver's initial insufficient funds check, the record indicates that Allstate received and credited $28.60 on March 16 and $14.70 on March 26. This total of $43.30 was more than adequate to handle the February and March payments ($26.80) and even duplicating the error of deducting an additional $16, there was no basis for any failure of consideration.

Furthermore, the policy acknowledged receipt of the policy premium for the period February 6, 1968-February 6, 1969, in the language set forth below.[4] In *Sawyer* v. *State Farm Fire & Cas. Co.*, 69 Cal.2d 801 [73 Cal.Rptr. 232, 447 P.2d 344], the California Supreme Court held at pages 806-807 that the acknowledgment of the receipt of the premium in the policy was conclusive evidence of payment and precluded the insurer from cancelling the policy for nonpayment. In *Sawyer*, as here, after cancellation of a policy for nonpayment of premiums and denial of cov-

---

[4]"Allstate Insurance Company . . . Agrees with the insured, named in the declarations attached hereto and made a part hereof, *in consideration of the payment of the premium* and in reliance upon the statements in the declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy."

erage, a default judgment was taken against the insured. Our Supreme Court upheld the trial court's exclusion of evidence relating to premium payments and held the insurer liable for the total amount of the default judgment ($27,530.45) in excess of the policy limits of $10,000. The court based its holding on Insurance Code section 484 (likewise set forth below)[5] based on former Civil Code section 2598, that as early as 1890 had been construed to make the policy binding (*Farnum* v. *Phoenix Insurance Co.*, 83 Cal. 246, 255 [23 P. 869]). Also in accord are *Kamischer* v. *J. Hancock Mut. L. Ins. Co.*, 1 Cal.App.2d 629 [37 P.2d 126], and *Masson* v. *New England Mut. & Life Ins. Co.*, 85 Cal.App. 633 [260 P. 367].

■ As there is no question that Allstate had no right to cancel Oliver's policy for nonpayment of the premium, Allstate wrongfully denied coverage, and Oliver was relieved of any obligations imposed on him by the policy. We conclude, therefore, that the trial court erred in finding that Oliver was estopped from enforcing the default judgment against Allstate.

■ As to Drinnon, the trial court found that he was estopped from enforcing the default judgment against Allstate because of the prior conduct of his attorney Tunney. This finding is based on an assumption that Tunney's repeated contacts with Allstate on several occasions to ascertain its position and to point out the bookkeeping error created a duty of full disclosure and the basis of equitable estoppel. A person may not lull another into a false sense of security by conduct causing the latter to forego to do something which he otherwise would have done and then take advantage of the inaction caused by his own conduct (*Lovett* v. *Point Loma Development Corp.*, 266 Cal.App.2d 70, 75 [71 Cal.Rptr. 709]). " ' "In general, four things are essential to the application of the doctrine of equitable estoppel: first, the party to be estopped must be apprised of the facts; second, he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; third, the other party must be ignorant of the true state of facts; and fourth, he must rely upon the conduct to his injury." ' (*Safway Steel Products, Inc.* v. *Lefever* (1953) 117 Cal.App.2d 489, 491 [256 P.2d 32]; in accord *Johnson* v. *Johnson* (1960) 179 Cal.App.2d 326, 330 [3 Cal.Rptr. 575].) In *Newhall* v. *Hatch* (1901) 134 Cal. 269, 274 [66 P. 266, 55 L.R.A. 673], it is said: 'Mere silence on the part of a party will not create an estoppel, *unless he was under some obligation to speak, and a party invoking such estoppel must show that it was the duty of the other to speak, and that he has not only been induced to act by reason of such silence but that the other had reasonable cause to believe*

---

[5]"An acknowledgment in a policy of the receipt of premium is conclusive evidence of its payment, so far as to make the policy binding, notwithstanding any stipulation therein that it shall not be binding until the premium is actually paid."

*that he would so act.'* (See also *People* v. *Ocean Shore Railroad, Inc.* (1948) 32 Cal.2d 406, 421-422 [196 P.2d 570, 6 A.L.R.2d 1179].) The burden is on the party asserting an estoppel to establish all of the elements constituting it. (*Bear Creek Co.* v. *James* (1953) 115 Cal.App.2d 725, 732 [252 P.2d 723].) The doctrine of estoppel must be applied strictly and established in every particular." (Italics ours.) (*Transport Clearings-Bay Area* v. *Simmonds,* 226 Cal.App.2d 405, 427-428 [38 Cal.Rptr. 116].) In addition, the person seeking estoppel must show diligence on his own part (*Hampton* v. *Paramount Pictures Corp.,* 279 F.2d 100 [84 A.L.R.2d 454]). The trial court here justifiably found negligence on the part of Allstate.

The record indicates that despite Tunney's efforts, Allstate consistently and vehemently denied coverage and repeatedly indicated that it would not be involved. There is no question that Allstate became aware of its error in ample time to protect its interest as Rohland testified that he knew about Tunney's claim concerning the improper deduction of the $16 premium from the Willys policy. The uncontroverted evidence indicated that sometime before December 27, Rohland had been instructed to refer the matter to an attorney. Yet, Rohland's letter of December 27, responding to Tunney's letter of December 11, that clearly set forth his intention to file suit, reiterated that Allstate disclaimed and denied all liability. Further, again, Tunney's letter of January 3 clearly stated his intention to file suit on behalf of Drinnon.

Thus, unlike *Lovett, supra,* there was no active conduct by Tunney that led Allstate to forbear to do something it would otherwise have done. The uncontroverted evidence indicates that Allstate waited over a month to answer Tunney's letter of January 3. Haak's reply reiterated Allstate's prior position that the policy had been cancelled. Under the circumstances, the last sentence of Haak's letter asking Tunney to contact Allstate "if he had any further questions" was merely a polite form of closing.

Nor can Allstate rely on Tunney's silence concerning the filing of the complaint unless there was a duty to speak. As noted above, Oliver was under no duty after Allstate wrongfully denied coverage. In view of Allstate's repeated assertions of no coverage, the correspondence and contacts between Tunney and Allstate never came close to becoming negotiations for a settlement.

Here, Tunney made full disclosure on all occasions, notified Allstate of his representation of Drinnon as early as July 15, 1968, and clearly advised of his intent to file suit on December 11, 1968. Tunney's last communication with Allstate, the letter of January 3, indicates no change in his intention to pursue his client's claim against Oliver. The action against Oliver

was filed on January 17, 1969, two full weeks after the last communication with Allstate. We conclude that the trial court erred in concluding that Allstate had met the burden of establishing all of the elements of equitable estoppel. We hold that the prior communications between Tunney and Allstate did not require that he further notify Allstate that the action had been filed.

■ Nor can an estoppel be asserted on the basis of the merger of interests of Drinnon and Oliver as the result of their written agreement of settlement. The record indicates that the settlement agreement was not reached until March 12, two days after oral rendition of the judgment in favor of Oliver. The identical issue was raised and put to rest in *Critz* v. *Farmers Ins. Group,* 230 Cal.App.2d 788 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142]. In that case, the hold harmless agreement was entered into between the plaintiff and defendant even *before* suit was filed. In rejecting the insurer's contention that the assignment violated the policyholder's duty to cooperate, the court, after noting that the law favors settlements, said at pages 801 and 802: "The requirement of cooperation by the policyholder assumes that the insurer has complied in good faith with the conditions of the policy [citations]. An insurer may be estopped to claim breach of a cooperation clause which has been induced by its own action. [Citations.] When the insurer breaches its obligation of good faith settlement, it exposes its policyholder to the sharp thrust of personal liability. At that point, there is an acute change in the relationship between policyholder and insurer. The change does not or should not affect the policyholder's obligation to appear as defendant and to testify to the truth. He need not indulge in financial masochism, however. Whatever may be his obligation to the carrier, it does not demand that he bare his breast to the continued danger of personal liability. By executing the assignment, he attempts only to shield himself from the danger to which the company has exposed him. He is doubtless less friendly to his insurer than he might otherwise have been. The absence of cordiality is attributable not to the assignment, but to his fear that the insurer has callously exposed him to extensive personal liability. The insurer's breach so narrows the policyholder's duty of cooperation that the self-protective assignment does not violate it." It follows that if an assignment made before judgment is valid as against an insurer who wrongfully refuses to defend, one made after judgment, as here, is likewise valid. We conclude that neither Oliver nor Drinnon was estopped from enforcing the default judgment against Allstate.

■ We turn to the contention that on jurisdictional grounds, the default judgment was properly vacated as void on its face as the original summons had not been returned to the court prior to entry of the default.

The complaint was filed on January 17, 1969. Oliver was served with a copy of the summons on January 28, 1969, *as attested by the affidavit of service of summons and complaint filed February 11, 1969.* Oliver's default was entered on February 11, 1969. On March 10, 1969, the default judgment was entered in the clerk's minutes. On March 20, 1969, the original summons was returned and a written judgment of default signed by the court.

The pertinent provisions of the applicable statutes are: 1) former Code of Civil Procedure section 410, which provided that *when the summons is served, it must be returned to the plaintiff if he is acting as his own attorney, otherwise, to plaintiff's attorney with the affidavit of service and a copy of the complaint;* 2) Code of Civil Procedure section 585, subdivision 2, which requires that the defendant be personally served prior to entry of a default judgment; and 3) Code of Civil Procedure section 581a, which requires dismissal if the summons has not been returned within the three years.

Witkin observes in California Procedure, second edition, volume 2, pages 1449 and 1450: "Proof of service of summons is required to inform the court that the defendant has received the necessary jurisdictional notice. [Citation.] Such proof is normally made by a sworn affidavit or 'return' of the person who served the process. (See *Los Angeles* v. *Morgan* (1951) 105 C.A.2d 726, 234 P.2d 319; C.E.B., Civ. Proc. Before Trial, p. 482; 3 Cal Practice 186; C.E.B., Cal. Jurisdiction and Process, p. 86; 82 A.L.R.2d 668 [effect of failure to make return]; 31 A.L.R.3d 1393 [liability for false or fraudulent return]; on affidavit or certificate, see *infra,* § 666; on written admission of service, see *infra,* § 669.)

"The word 'return' has a number of meanings in procedural law, and two of them apply to service of process. *First,* and most commonly, it means *a paper:* the 'indorsement in writing' or statement of the process server (officer or private person) certifying what he has done, which constitutes the proof of service. *Second,* it means *an act:* the act of *delivering back* the process *to the court* with the above mentioned certificate or affidavit, so that the court may be informed of the fact that the requisite notice has been given. [Citation.] In the latter sense, 'return thereon made' (C.C.P. 581a) *calls for filing of the original summons and proof of service within 3 years after commencement of the action . . . ;* see also Govt. C. 26663 [requiring return by sheriff or other officer 'without delay'; cf. Fed. Rule 4(g).)" (Italics added.)

Allstate argues that the affidavit of service was not sufficient to establish the court's jurisdiction to enter Oliver's default on February 10 in the absence of the original summons, which was not returned to the court until

March 20.. We cannot agree. We note that here, all of the express statutory requirements were met: Oliver was personally served prior to entry of the default and the summons returned to Drinnon's attorney and filed before the expiration of the three-year period of Code of Civil Procedure section 581a.

The fact that none of the above mentioned statutes specifically requires that the original summons must be returned to the court prior to entry of a default is persuasive evidence that the Legislature did not intend that the failure to return the original summons to the court prior to entry of a default be considered a jurisdictional defect (cf. *William Iser, Inc.* v. *Garnett,* 46 Misc.2d 450 [259 N.Y.S.2d 996, 998]). The return of the original process is prima facie evidence of proper service, but may be impeached by contradictory evidence (*City of Los Angeles* v. *Morgan,* 105 Cal.App.2d 726 [234 P.2d 319]). Conversely, if the process is correct, a defective affidavit will not be fatal to jurisdiction and can be amended. Failure to file proof of service of summons does not divest the court of jurisdiction (*In re Spiers,* 32 Cal.App.2d 124 [89 P.2d 456]). If the fact of service is established, jurisdiction cannot be questioned. "Jurisdiction does not depend upon proof of service, but upon the fact that service has been made" (*Spiers, supra,* at p. 127). Here, the fact of Oliver's service on January 28, 1969, was established by the filing of the affidavit of service on February 11, the same day the default was entered. We hold that since Drinnon complied with all of the statutory requirements for service and return of the summons, the trial court erred in holding that the default judgment was void on its face for lack of jurisdiction.

We turn next to the contention that the trial court erred in permitting Allstate to intervene after judgment, contrary to Code of Civil Procedure section 387. The portion of the statute is set forth in the footnote below.[6] It is well settled that under this section, intervention is not permitted after trial has been concluded and judgment rendered (*Leonard Corp.* v. *City of San Diego,* 210 Cal.App.2d 547 [26 Cal.Rptr. 730];

---

[6]"At any time before trial, any person, who has an interest in the matter in litigation, or in the success of either of the parties, or in interest against both, may intervene in the action or proceeding. An intervention takes place when a third person is permitted to become a party to an action or proceeding between other persons, either by joining the plaintiff in claiming what is sought by the complaint, or by uniting with the defendant in resisting the claims of the plaintiff, or by demanding anything adversely to both the plaintiff and the defendant, and is made by complaint, setting forth the grounds upon which the intervention rests, filed by leave of the court and served upon the parties to the action or proceeding who have not appeared, and upon the attorneys of the parties who have appeared, who may answer or demur to it within ten days from the service thereof, if served within the county wherein said action is pending, or within thirty days if served elsewhere."

*Beshara* v. *Goldberg,* 221 Cal.App.2d 392 [34 Cal.Rptr. 501]). Here, unlike *Johnson* v. *Hayes Cal Builders, Inc.,* 60 Cal.2d 572 [35 Cal.Rptr. 618, 387 P.2d 394], cited by Allstate, there is no issue as to whether a valid default hearing actually occurred. We conclude that Allstate should not have been permitted to intervene.

In view of our conclusion that the order appealed from must be reversed, we need not discuss the remaining contentions on appeal. ▮ We merely note that Allstate was well aware of its mistake and could not obtain relief on grounds of mistake, inadvertence, surprise and excusable neglect, pursuant to Code of Civil Procedure section 473, as it did not act with "the same degree of diligence as a man of ordinary prudence usually bestows upon his important business affairs" (*Beall* v. *Munson,* 204 Cal. App.2d 396, 400 [22 Cal.Rptr. 333]; *Kooper* v. *King,* 195 Cal.App.2d 621, 626 [15 Cal.Rptr. 848]; *Garcia* v. *Gallo,* 176 Cal.App.2d 658 [1 Cal. Rptr. 539]; *Gorman* v. *California Transit Co.,* 199 Cal. 246 [248 P. 923]).

The order appealed from is reversed.

Kane, J., and Rouse, J., concurred.